KELLEY-DEMPSEY & COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 66806. Promulgated October 16, 1934.

*H. A. Mihills, C. P. A.,* for the petitioner.
*George D. Brabson, Esq.,* for the respondent.

---

[1] See Harvard Law Review, note, Vol. XLVII, p. 669 (Feb. 1934).

OPINION.

GOODRICH: The testimony tells a tale of graft. Petitioner was held up and had to pay. Until it did, the work under its contracts

was impeded through harrassing tactics by gas company employees who demanded subsidies before they would honestly discharge their duties; it lost money. After it "greased some palms", its work was accepted, promptly and without question; its contracts were completed within the allotted time or before; it made profits.

Payments made in 1929 to Evanoff and Gaston for so-called cooperation are not here in issue—why not, we are not told. The question presented for our determination is, whether payments, totaling $34,412.39, made in 1929 to Van Hook in consideration of his promise to see "that we got our materials on the job promptly", that "the inspectors on the particular jobs were kept in line and would not be arbitrary but would cooperate", are deductible from petitioner's income as a part of the expenses of its business. Our answer to that question is—no.

Assuming (but not deciding) that these payments are "expenses" of petitioner's business, clearly, they are not deductible[1] for they are not *ordinary* expenses. Said Mr. Justice Cardozo in considering the meaning of the word "ordinary" as applied to expenses of a business (*Welch* v. *Helvering*, 290 U. S. 111):

> Now, what is ordinary, though there must always be a strain of constancy within it, is none the less a variable affected by time and place and circumstance. Ordinary in this context does not mean that the payments must be habitual or normal in the sense that the same taxpayer will have to make them often. A lawsuit affecting the safety of a business may happen once in a lifetime. The counsel fees may be so heavy that repetition is unlikely. None the less, the expense is an ordinary one because we know from experience that payments for such a purpose, whether the amount is large or small, are common and accepted means of defense against attack. Cf. *Kornhauser* v. *United States*, 276 U. S. 145. The situation is unique in the life of the individual affected, but not in the life of the group, the community, of which he is a part. At such times there are norms of conduct that help to stabilize our judgment, and make it certain and objective. The instance is not erratic, but is brought within a known type.
>
> *          *          *          *          *          *          *
>
> Unless we can say from facts within our knowledge that these are ordinary and necessary expenses according to the ways of conduct and the forms of speech prevailing in the business world, the tax must be confirmed. But nothing told us by this record or within the sphere of our judicial notice permits us to give that extension to what is ordinary and necessary.

The question here comes down to this: Is it an ordinary thing to pay out money to induce the acceptance and approval of work well done, to induce the employees of another to promptly and honestly perform the duties for which they were hired? We believe that it is not. And petitioner's witness, its president, indicated clearly in his testimony that such was his opinion; that he regarded the de-

---

[1] The statute (sec. 23 (a), Revenue Act, 1928) provides for the deduction from gross income of " ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business."

mands as most unusual and unjust. The record does not tell us that such expenditures were common to the operation of a business such as petitioner's in the Mid-Continent oil field. We know that petitioner made them during three years—never before—but as to the practice of other enterprises in the field we are not told. Rumors are prevalent concerning extortions, "rackets", "shakedowns" in all lines of business, but veiled hints and "understandings" cannot serve as a ground for judicial notice that dishonesty, such as here disclosed, is a normal practice. Measured then by the norms of conduct of which we have notice (and this record fails to convince us that they have been changed), we must conclude that the payments made by petitioner to Van Hook were not ordinary, but, to the contrary, extraordinary.

Nor does it appear that they were *necessary*. Petitioner proves beyond dispute that its business was being ruined by groundless faultfinding and unjust practices until it acceded to the demands of those persons whose approval was necessary to the acceptance of work done under its contract. It shows that appeal to the chief engineer and to one of the directors of the company with which it had contracted and which had the troublemakers in its employ brought no relief; indeed brought only advice to pay up and avoid difficulty. And it shows that after it agreed to contribute as demanded, its impediments vanished; that it completed its contracts profitably and promptly, and obtained more, upon bids which included a spread sufficient to supply funds to be passed on.

No doubt, that was the easiest and quickest way out of its difficulties, but it was not *necessary* for petitioner to adopt that course. The courts were open to it, wherein it could have proved the substantial performance of its contracts and demanded payment therefor. Moreover, the laws of Oklahoma afforded it protection against extortion—if the threats and solicitations of Van Hook and the others amounted to that—by the punishment provided for those attempting it. To be sure, the prosecution of proceedings against the gas company for the enforcement of petitioner's rights under its contract would have been expensive, perhaps tedious, and probably would have resulted in the loss of any future business with that company. And the instigation of criminal prosecution of the gas company employees for such of their acts (if any) as were unlawful would be troublesome and disagreeable. But, for all this record tells us, the normal business conduct of the group, the community, would have made the doing of *these* things *necessary*, and not the adoption of the course chosen by petitioner—the "paying of tribute" as it is described on the record.

Moreover, to encourage the accession to demands of this sort, both morally and legally wrongful, by straining the common meaning of

the words of the statute to permit such payments to be deducted as ordinary and necessary expenses of operating a business would be poor public policy. This Board and the courts have consistently refused to do so with respect to expenditures occasioned by somewhat comparable causes.[2]

Reviewed by the Board.

*Judgment will be entered for the respondent.*

SMITH concurs in the result.

---

[2] As to illegal expenses such as bribery, see *United States* v. *Sullivan,* 274 U. S. 259 ; as to expense incurred in defending an indictment for perjury, see *Sarah Backer et al., Executors,* 1 B. T. A. 214 ; as to fines, court costs, and attorney fees incurred in connection with an indictment for violation of antitrust laws, see *Columbus Bread Co.,* 4 B. T. A. 1126-; *Burroughs Building Material Co.,* 18 B. T. A. 101 ; affd., 47 Fed. (2d) 178 ; as to fines for violation of Federal statutes see *Great Northern Ry. Co.,* 8 B. T. A. 225 ; affd., 40 Fed. (2d) 372 ; certiorari denied, 282 U. S. 855 ; *Chicago, Rock Island & Pacific Ry. Co.,* 13 B. T. A. 988 ; affirmed on this issue, 47 Fed. (2d) 990 ; certiorari denied, 284 U. S. 618 ; *Terminal R. R. Association of St. Louis,* 17 B. T. A. 1135 ; affirmed on this issue, 61 Fed. (2d) 166 ; certiorari denied, 288 U. S. 604, 607 ; *B. E. Levinstein,* 19 B. T. A. 99.