T. G. NICHOLSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

MRS. T. G. NICHOLSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 89892, 89893. Promulgated July 28, 1938.

---

*John J. Finnorn, Esq., Edward Rightor, Esq.,* and *John F. Hartmann, C. P. A.,* for the petitioners.
*Harold Allen, Esq.,* for the respondent.

---

[Signed]    YOLANDE V. PERKINS

OPINION.

Leech: The petitioner, T. G. Nicholson, was at all times mentioned herein, an officer of the Gretna Trust & Savings Bank and president of that bank from 1921 through 1932. Since all of the acts or omissions hereinafter detailed were those of the petitioner, T. G. Nicholson, he will be referred to as the petitioner.

In October 1927, the petitioner and his brother-in-law, B. W. Clopton, formed a partnership under the name of Melville Ferry Co.,

for the purpose of operating a ferry at Melville, Louisiana. Each was to have a 50 percent interest and the profits were to be divided equally after provision had been made for a salary of $200 a month to Clopton for his services as manager of the business. For the period, from October 1927 to October 1929 the ferry was operated by the partnership under a joint franchise, granted by the town of Melville and Point Coupee Parish. This franchise had been procured by these parties at a cost of $10,000, which sum they had borrowed, and, for the first year of operation, a considerable part of the earnings of the ferry were applied toward the payment of this indebtedness. In October 1929, the franchise expired and it was decided that it would not be renewed but that the Louisiana Highway Commission would operate it, by contract, as a free ferry. Petitioner and his partner, thereupon, secured a contract, under conditions later described herein, from the Louisiana Highway Commission to operate the ferry for a compensation of $80 per day, which contract terminated in the month of April 1932.

The operation of the ferry and collection and disbursement of the income were left wholly to B. W. Clopton, as petitioner's home and place of business at Gretna, Louisiana, were approximately 130 miles away. Such books and records as the partnership maintained were kept by Clopton and cash remittances on account of petitioner's share of partnership profits were made by Clopton to petitioner as follows:

| | |
|---|---|
| 1928 | $1,000.00 |
| 1929 | 11,815.46 |
| 1930 | 2,098.00 |
| 1931 | 11,350.00 |
| 1932 | 17,943.67 |
| Total | 44,207.13 |

The contract for operation of the ferry for the Louisiana Highway Commission had been obtained by the partnership through the political influence of State Senator Jules G. Fisher, with whom the petitioner had made an arrangement under which Senator Fisher would receive one-third of the profits of the partnership for exerting his political influence toward the securing of the contract. Later, upon the expiration of the contract, when advertisement for bids was made by the Louisiana Highway Commission for the operation of the ferry for the following period, petitioner and his partner decided not to bid but obtained the services of Senator Fisher and the use of his political influence to have inserted in the conditions covering the bidding on the contract, that the successful bidder would be required to purchase the ferry equipment belonging to the partnership. This provision was favorable to the partnership. It was agreed that Senator Fisher should receive, in consideration of

the use of his political influence, one-third of any profit resulting to the partnership from the sale of the equipment. Senator Fisher was successful in securing the insertion of this provision and the equipment of the partnership was sold to the successful bidder at a profit.

Out of the remittances listed above, received by this petitioner as partnership profits remitted to him by Clopton, payments, by petitioner on behalf of the partnership to Senator Fisher for exercising such political influence, were made at times and in amounts as follows:

| | |
|---|---|
| 1931 | $2, 500. 00 |
| 1932 | 9, 427. 80 |
| Total | 11, 927. 80 |

The books and records of the Melville Ferry Co. were kept on a fiscal year basis ending September 30. The net income of the partnership for all the years mentioned herein, including profits from operation and from sale of assets, and the distributive shares of partnership income for each year before deduction of the payments to Jules G. Fisher, were as follows:

| Fiscal year | Net income | Distributive share of income | |
|---|---|---|---|
| | | T. G. Nicholson | B. W. Clopton |
| 1928 | $14, 407. 78 | $6, 003. 89 | $8, 403. 89 |
| 1929 | 20, 025. 15 | 8, 812. 58 | 11, 212. 57 |
| 1930 | 15, 856. 67 | 6, 728. 33 | 9, 128. 34 |
| 1931 | 18, 029. 82 | 7, 814. 91 | 10, 214. 91 |
| 1932 | 14, 057. 92 | 6, 428. 96 | 7, 628. 96 |
| Total | 82, 377. 34 | 35, 788. 67 | 46, 588. 67 |

None of the income, consisting of petitioner's distributive share of profits from the partnership, was reported by him, in the joint income tax returns filed by him and his wife for 1928 to 1930, inclusive, nor in the separate income tax returns filed on the community property basis by petitioner and his wife for the years 1931 and 1932. No partnership return was filed for any of the years mentioned herein.

The personal income tax returns of B. W. Clopton for the years here in question were prepared by one Waterbury, who was the bookkeeper for the Palmetto Mercantile Co., in which business Clopton was a partner. Waterbury had no connection with the Ferry Co. and merely made a final computation of income resulting from its operations. This computation was made on the basis of the books and records as kept by Clopton during the year. The net income, as computed by Waterbury, was included in each year with income of Clopton from

other sources and the entire income reported in Clopton's return. Waterbury did this because he was ignorant of petitioner's interest in the ferry partnership. It followed that Clopton reported the total income of the Melville Ferry Co. and paid income tax on the whole of that income, as set out above, including petitioner's distributive share and without deduction of any amounts paid by the partnership to Senator Fisher. Neither Clopton nor Waterbury was familiar with income tax requirements and neither one was aware of the fact that the filing of a partnership return was required. The petitioner became aware of the fact that the total income of the partnership *was* being included in the return of Clopton in 1929 after *the filing* of the return for 1928. However, in the four succeeding years, he permitted this method of returning the income to be continued.

The contested deficiencies for the taxable years 1928, 1929, 1930, and 1931 are barred by the statute of limitations except those for such years for which the tax return was "false or fraudulent * * * with intent to evade tax." Revenue Act of 1928, sec. 276 (a).

If, and only if, either of petitioners' returns for any of these years was within that prohibition, then a second issue of fraud is presented as to those years. That issue is whether any part of any one of those deficiencies "is due to fraud with intent to evade tax." Revenue Act of 1928, sec. 293 (b).

Since the deficiencies determined against both petitioners for 1932 are not barred by the statute of limitations, the latter issue of fraud is, alone, involved. And, as to such deficiencies the petitioner has the burden of showing error. *Welch* v. *Helvering*, 290 U. S. 111. In the fraud issues, respondent has the burden of proof. Revenue Act of 1924, sec. 907 (a), as amended by the Revenue Act of 1928, sec. 601. It must be established by clear and convincing evidence, not only that the return for any year was false but that it was filed "with intent to evade tax." See *Summerill Tubing Co.*, 36 B. T. A. 347; *Charles J. Delone*, 34 B. T. A. 1139; *Drawoh, Inc.*, 28 B. T. A. 666.

Admittedly, all the returns for each year in question were false. Does the record disclose by clear and convincing evidence that petitioners, or either of them, filed any such returns "with intent to evade tax"?

Petitioner is a highly intelligent person. His distributive share of the partnership income for 1928 was considerable. He was required to report that share as his income. Revenue Act of 1928, sec. 54. He actually received $1,000 from the partnership in 1928. He did not report any partnership income because, he says, in effect, he did not know what the partnership income for 1928 was when he filed his return for that year. That is not unreasonable under the circumstances. The methods under which the partnership operated were

very informal. He was not in close contact with the business or its finances. He did not receive a report of the results of the business for 1928 until January 27, 1932. His return for that year is not in evidence. But the notice of the determination of the deficiency indicates that he reported a net income of $13,643.41 for that year. It was the first year the partnership had operated the ferry. He knew they were indebted for funds borrowed for the business. He thought those obligations were all to be paid before any distribution was made and they had not all been paid during that year.

At most, the evidence is not clear and convincing that petitioner's return for 1928 was filed "with intent to evade tax." It follows that the deficiency for that year is barred. Revenue Act of 1928, sec. 275 (a). The proposed fraud penalty therefor is denied.

But the picture involving the deficiencies for the following four years is different.

Petitioner admits that the omissions of partnership income in his returns for all these years were willful and that, at least for the last three years, were willfully illegal.

He testifies that, after he filed his return for 1928, he learned from Clopton that, because of inability to get in touch with petitioner before filing his return for that year, Clopton had reported all the income from the partnership for that year in his return and had paid the tax thereon.

It is evident that petitioner then realized his return for that year was false in failing to return his share of the partnership income. Yet, despite that knowledge, he not only failed to correct that return but permitted the error to be continued in his returns for the four succeeding years. That was an unusual course of conduct, particularly in one in such a position as petitioner. He says, and the record corroborates him, that, from 1930, if not earlier, he feared the legal consequences of this procedure and intended to correct it. But it was not corrected.

Petitioner's apparent position is that, if, when he filed the several returns, he intended that the Government should receive all the income taxes on the partnership income to which it would have been entitled had it been properly returned, it is immaterial who returned that income and paid those taxes. He testifies that, when the returns now under discussion were filed, he thought the Government was receiving as much tax on the partnership income, when reported entirely by Clopton, as it would have received had he correctly returned his share. He says he reached that conclusion from the fact that the partnership income was all returned by Clopton and that the auditor of the bank with which he was connected so advised him, and

that, since the matter was in such a "mess," it was better to allow it to remain so.

If we assume the truth of petitioner's testimony, the soundness of his legal position, and therefore the materiality of the advice from the auditor, the facts upon which that advice was predicated are not in evidence. How did the auditor know that the Government was receiving all the taxes on the partnership income to which it would have been entitled if that income had been correctly returned by the petitioner? Surely, if the position of the petitioner were valid legally, neither his mere estimate of that result nor that of another would support the position. See *Charles J. Delone, supra; M. Rea Gano*, 19 B. T. A. 518. The net tax result to the Government on petitioner's false returns is not shown. The question of counsel for respondent in the cross-examination of petitioner, asking "Don't you recall that it was pointed out to you that the whole thing could have been straightened out by the filing of claims for return [refund] by Mr. Clopton before the statute ran on all the years, at a net cost of $41 and some odd cents?" and its negative answer do not establish anything. Of even less value here is the advice petitioner says he received after the returns for 1932 were filed, that he and his wife had paid $1,000 more taxes for the years in controversy than they would have been required to pay had they filed separate instead of joint returns for 1928, 1929, and 1930.

It is but a short step from gross negligence to fraud. *M. Rea Gano, supra*. Considering all the circumstances, we think the petitioner's returns for each of the years 1929, 1930, 1931, and 1932 were more than grossly negligent. They were fraudulent.

Again, the pertinent words of the controlling statute are "with intent to evade tax." This must mean the tax of the petitioner, T. G. Nicholson. He could evade no other tax. The term "tax" under the revenue acts has a very definite meaning. It is "an involuntary charge imposed by legislative authority for public purposes." *Bank of Mount Hope*, 25 B. T. A. 542.

Clopton could not legally report petitioner's share of the partnership income as petitioner's agent. Revenue Act of 1928, sec. 54. Petitioner knew that. Whether there was an agreement between the partners that it should be so reported or that any proportion of the taxes paid by Clopton should be contributed by the petitioner, is immaterial here. When petitioner received the statements in January 1932, covering operation of the ferry from the preceding four years, he learned that Clopton had charged his partnership account and credited Clopton's account with a proportion of the amount paid by Clopton as income taxes on the partnership income for each of those years. That proportion was fixed solely by Waterbury, who pre-

pared the returns. There is nothing in the evidence indicating that either Clopton or petitioner intended that Clopton should report petitioner's partnership income for these years as petitioner's agent. The evidence is conclusive that Clopton reported it as his income and paid the taxes thereon. Petitioner knew this and intended it so. His contribution to Clopton of any amount, whether designated as tax, or otherwise, was not, in fact, petitioner's tax on his income nor was it a "tax" at all. It was not "an involuntary charge on petitioner imposed by legislative authority for public purposes."

Whether Clopton overstated his income for these years is not the issue. Our query is limited to whether petitioner understated his income for those years with intent to evade his tax. Admittedly, he never returned his share of the partnership income for any of these years. Nor has he yet paid his tax on that income. That this was willful, is beyond question. He intended just that. The fact that his income was returned by Clopton and a tax paid on it deliberately and with petitioner's knowledge when his returns, omitting that income, were filed, does not contradict that intent. The facts are that petitioner did not return his income or pay his tax on that income. When the returns were filed he did not intend to do so. He intended not to return his income and not to pay his taxes.

We conclude from the record that petitioner's returns for 1929, 1930, 1931, and 1932 were all false and fraudulent with intent to evade tax. The deficiencies determined against him are, therefore, not barred for any of those years.

As to the year 1932, the deficiency in tax, determined against each petitioner, is sustained. Petitioner contends now that, in computing the partnership income, the payments to Senator Fisher are deductible as ordinary and necessary expenses of the partnership. The record is convincing that these payments were not made for legitimate services rendered, but purely for the exercise of political influence possessed by Fisher as a state senator. In fact, the petitioners stipulated that the payments were made for political influence. As such they do not constitute expenses deductible in computing net income. *Easton Tractor & Equipment Co.*, 35 B. T. A. 189; *Oscanyan* v. *Arms Co.*, 103 U. S. 261; *Crocker* v. *United States*, 240 U. S. 74. Petitioner's counsel has invited our attention to the recent reversal by the United States Circuit Court of Appeals for the Fifth Circuit of our decision in *Alexandria Gravel Co.*, 35 B. T. A. 323. In that case we disallowed, as deductible expenses, payments made to a Louisiana state senator of commissions upon sales made by him of materials to certain state agencies. In reversing our decision in that case the Circuit Court did not approve payments made a state

official for the use of his political influence, as deductible expenses, but held that the proof submitted in that case did not establish that the payments were made for such influence. The court held that the purchases were shown to have been made upon the basis of competitive bids submitted. In the present case no such showing is made, but the payments made to Senator Fisher are stipulated to have been made for the use of his political influence. As such, they are obviously of the character commonly known as "graft" and not deductible as ordinary and necessary business expenses.

Since there was no fraud in the return of the petitioner, T. G. Nicholson, for 1928, any deficiency against him for that year is barred. Revenue Act of 1928, sec. 275 (a). As to all other years, no error has been established in the determination of any of the deficiencies, as adjusted by stipulation, except that against the petitioner, Mrs. T. G. Nicholson, for 1931, and those deficiencies, as so adjusted, are sustained.

Because these deficiencies were determined on petitioner's omitted partnership income, it follows that part of each of such deficiencies determined against him was due to his fraud with intent to evade tax. Consequently, the proposed fraud penalties against him for these years are sustained. Revenue Act of 1928, sec. 293 (b).

On brief, respondent says:

Deficiencies of $49.53 for 1931 and $116.31 for 1932 automatically result from the adjustments to her husband's income hereinabove discussed, in as much as she had no separate income; although she filed separate returns for 1931 and 1932 the income reported was on a community basis.

No evidence of fraudulent intent on the part of Mrs. Nicholson, or evidence that she participated in or had knowledge of her husband's financial transactions, being available, the charge of fraud in her case is not pressed.

In view of the statement contained in the last quoted paragraph, and the record generally, we think the respondent has not sustained his burden of proof in establishing either that the return of the petitioner, Mrs. T. G. Nicholson, for 1931, was false or fraudulent with intent to evade tax or that any part of the deficiencies determined against her for either 1931 or 1932 was due to her fraud. Consequently, the deficiency determined against her for 1931 is barred (see *Harold B. Franklin*, 34 B. T. A. 927), and the fraud penalty proposed against her for each of such years is denied.

Reviewed by the Board.

*Decisions will be entered under Rule 50.*