## RUGEL v. COMMISSIONER OF INTERNAL REVENUE.

### No. 12111.

Circuit Court of Appeals, Eighth Circuit.

April 14, 1942.

Albert F. Hillix, of Kansas City, Mo. (John E. Park and Gage, Hillix, Hodges & Cowherd, all of Kansas City, Mo., on the brief), for petitioner.

Warren F. Wattles, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch and Gerald L. Wallace, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before THOMAS and JOHNSEN, Circuit Judges, and REEVES, District Judge.

JOHNSEN, Circuit Judge.

Petitioner seeks a review of a decision of the Board of Tax Appeals, which redetermined deficiencies of $6,374.15 and $3,824.19 in his income taxes for the years 1937 and 1938 respectively.

The deficiencies arose out of the Board's refusal to allow certain deductions which petitioner had made in his returns. These consisted of alleged "commissions and bro-

kerage" paid to W. T. Doherty, in the sums of $18,763.27 in 1937 and $14,157.70 in 1938, and alleged "advertising, promotion, entertainment, cab, laundry and miscellaneous travelling expense", in the sums of $1,799.-50 for 1937 and $2,789.31 for 1938. The Commissioner had disallowed all of these deductions in their entirety. The Board followed the Commissioner's holding as to the payments to Doherty, on the ground that they did not represent compensation for business services, but were the purchase price of political influence to obtain and hold public contracts. It modified the Commissioner's holding as to the "promotion and entertainment" expenses, to the extent of allowing deductions of $800 for 1937 and $1000 for 1938, and disallowing the balance.

Petitioner was engaged in selling revenue stamps for use by a state in its tax upon packaged liquor. In 1934, the State of Missouri, after taking bids, had entered into a contract to purchase its revenue stamps from the firm which plaintiff represented. The contract did not fix the period of time for which it was to be in force. In 1935, at the direction of the State Supervisor of Liquor Control, orders were given to another firm for part of the stamps which the State was using. Petitioner discovered that these orders had been given to his competitor at the request of W. T. Doherty, who was a personal friend of the State Supervisor of Liquor Control. The orders were given without the taking of bids and were apparently for a higher purchase price than that at which petitioner's firm had agreed to furnish the stamps. The representative of petitioner's competitor had agreed to split his commissions with Doherty.

Doherty was engaged in the wrecking business in Kansas City, Missouri. He was a precinct captain in the political organization of T. J. Pendergast, who was at that time the political boss of Kansas City. Doherty admitted that he was a personal friend of Pendergast and that he had "loaned" money to Pendergast that was never repaid. The State Supervisor of Liquor Control was a resident of Kansas City. Petitioner too lived in Kansas City and was also a precinct captain in the Pendergast organization.

When petitioner discovered what was happening on his revenue stamp business, he approached Doherty and made a deal with him to give him one-half of all the commissions which petitioner would receive from the sale of such stamps to the State of Missouri, if Doherty would switch the rest of the business to him. From the record, it is clear that the State Supervisor of Liquor Control had promised Doherty the control of one-half of the State's stamp purchases. At one point in his testimony petitioner stated: "I knew I couldn't get the remainder of that business unless I had Mr. Doherty working with me." An Internal Revenue Agent testified that petitioner had stated, in one of his conversations with him, "that the amounts were paid for Mr. Doherty's influence in securing contracts which could not otherwise have been gotten from the State of Missouri, and that Doherty had the necessary contacts in Jefferson City".

Petitioner sought to make out that Doherty was a salesman and performed salesman's services, but this evidence is not convincing. Doherty admitted that he knew nothing about revenue stamps; he did not demonstrate any stamps; he did not take any orders for stamps; he did not deliver any stamps, he did not collect for any stamps; "I did not represent any company, I just represented Mr. Rugel (the petitioner)". He further declared, "My only connection with the sale of liquor stamps was in talking to (the Supervisor of Liquor Control)".

Petitioner testified that his company had approved the making of his deal with Doherty, and, because of the increased volume of business received, had increased the amount of his commission allowance to enable him to take care of Doherty. But this did not make Doherty the company's employee, in any sense that would enable petitioner to shift the question of tax responsibility from his own shoulders. The commissions on the stamp purchases were regularly paid by the company to petitioner, as they always had been. Petitioner included them in their entirety in the gross income set out in his tax returns. He made the payments which he had promised to Doherty and then sought to deduct them, as his personal expenses of doing business. The company obviously was not purporting to intrude itself into how, when or whether Doherty was paid. The evidence clearly justified the Commissioner and the Board in holding that, for tax purposes, the relationship and the payments were wholly personal matters between petitioner and Doherty.

It is unnecessary to attempt to review all the evidence here. Enough has been said to indicate that there was substantial evidence to support the conclusion of the Board that Doherty was being paid solely on the basis of his political influence and control. While it is of no immediate importance or necessary relevance here, it may be added in passing that there was evidence in the record to suggest that Doherty's split was not wholly a personal one, but was divided by him with his political boss Pendergast. Doherty purported not to have a definite recollection of this fact on the witness stand, but admitted that he had previously given a sworn statement to the government revenue agents declaring that Pendergast had received a $9,000 cut from the commissions which petitioner had split with him.

As we have indicated, the Board clearly was justified in holding that the payments to Doherty did not constitute compensation for actual business services, but were simply the purchase price of Doherty's political influence. Payments made as the mere purchase price of political influence to obtain or hold public contracts cannot soundly be recognized as constituting "ordinary and necessary expenses" of business operations, within the meaning of, and subject to income tax deduction under, section 23(a) of the Revenue Acts of 1936 and 1938, 49 Stat. 1648, 52 Stat. 447, 26 U.S.C.A. Internal Revenue Acts, pages 827 and 1011.[1]

On the evidence in the record, the holding of the Board as to the amounts which petitioner was reasonably entitled to deduct for "promotion and entertainment" expenses must also be affirmed. Petitioner did not attempt any detailed explanation of these expenditures, but merely stated generally that they represented amounts which he had spent on business trips for "good will", "entertainment" and "promotion". They were in addition to his expenses for transportation, food and lodging, which the Commissioner had regularly allowed.

The Board's position with respect to these expenditures is aptly summarized in the following portion of its opinion: "At the hearing he (petitioner) was unable to identify any of the amounts or to tell what they represented other than 'entertainment or promotion'. Many of the items seem to be quite out of line with what one would usually expend. Typical are the items, usually $100, alleged to have been spent practically every time he made a trip to Jefferson City, even for a day or two. Other items impressing us as excessive are alleged expenditures of $200, $250, and $275 in connection with a stay of two or three days in New York or Chicago. Yet we are of the opinion petitioner made substantial expenditures for the purposes indicated and that they constituted ordinary and necessary expenses of his business. We therefore hold that in recomputing the deficiencies the following additional deductions from gross income should be allowed: For 1937, $800; for 1938, $1,000."

A taxpayer always has the burden of establishing his right to any claimed deduction for income tax purposes. Where he seeks to have a deduction allowed by the Board of Tax Appeals, as an ordinary and necessary business expense, within the meaning of section 23(a) of the Revenue Acts of 1936 and 1938, 49 Stat. 1648, 52 Stat. 447, 26 U.S.C.A. Internal Revenue Acts, pages 827 and 1011, he must furnish as definite proof as is reasonably possible, in the situation and circumstances, of the nature and details of the expenditures claimed to have been made. If the evidence is convincing that expenditures have thus been made, but the taxpayer is able to furnish only general proof of their nature and details, the Board should consider all the evidence in the light of its general experience and make such allowance for the sums expended as it conscientiously feels would represent fair and reasonable expenses for such ordinary and necessary purposes in the circumstances of the taxpayer's business.[2] Where this has been

[1] Compare Easton Tractor & Equipment Co. v. Commissioner of Internal Revenue, 35 B.T.A. 189; New Orleans Tractor Co. v. Commissioner, 35 B.T.A. 218; Nicholson v. Commissioner, 38 B.T.A. 190; Kelley-Dempsey & Co. v. Commissioner, 31 B.T.A. 351; Silberman v. Commissioner, 44 B.T.A. 600; Maddas v. Commissioner, 40 B.T.A. 572, affirmed 3 Cir., 114 F.2d 548; United States v. Sullivan, 274 U.S. 259, 264, 47 S.Ct. 607, 71 L.Ed. 1037.

[2] See Cohan v. Commissioner of Internal Revenue, 2 Cir., 39 F.2d 540, 543, 544, where Judge Learned Hand said: "Absolute certainty in such matters is usually impossible and is not necessary; the Board should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose in-,

done, the Circuit Court of Appeals has no right to substitute its judgment for that of the Board of Tax Appeals.[3] It is only where the Board has acted arbitrarily and without regard for the evidence that the Court may interfere in such a situation.

█ Here, the Board clearly cannot be said to have acted arbitrarily.

Affirmed.

exactitude is of his own making. * * * It is not fatal that the result will inevitably be speculative; many important decisions must be such."

[3] Compare Long Island Drug Co. v. Commissioner of Internal Revenue, 2 Cir., 111 F.2d 593; Doernbecher Mfg. Co. v. Commissioner of Internal Revenue, 9 Cir., 95 F.2d 296.