PORTO RICO RAILWAY, LIGHT & POWER COMPANY, Plaintiff and Appellant-Appellee, *v.* RAFAEL A. BUSCAGLIA, TREASURER OF PUERTO RICO, Defendant and Appellee-Appellant.

No. 8664. Argued July 6, 1943.—Decided November 22, 1943.

*Brown, González & Newsom* for appellant-appellee. *M. Rodríguez Ramos, Acting Attorney General,* and *Carmen B. Hernández, Law Clerk,* for appellee-appellant.

Mr. Justice Snyder delivered the opinion of the court.

This is a case in which both parties have appealed from different portions of the judgment of a district court in a suit for refund of $59,216.41 paid under protest as a result of deficiencies assessed for income taxes.

## I

The first cause of action in the taxpayer's suit related to its return for 1929. Porto Rico Railway, Light and Power Company in its returns for 1928 and 1929 claimed certain substantial deductions for losses resulting from the 1928 hurricane. In 1932 the Treasurer disallowed these deductions in large part and determined deficiency assessments therefor. There were various proceedings before the Treasury and the Board of Review and Equalization not necessary to detail here, except to state that by 1936, through actions of the Treasurer and the Board, it was finally conceded that the Company had been substantially correct in its contentions (The loss resulting from the 1938 hurricane was claimed to be $375,048.05; the amount finally established was $374,921.90).

However, instead of making the corresponding refunds, the Treasurer on March 4, 1937—seven years and ten months after the 1928 return was filed, and six years and ten months after the 1929 return was filed—notified the Company of a new deficiency for 1929 for approximately $10,000 with interest. This deficiency was grounded on the refusal of the Treasurer to allow the Company to deduct from its gross income the sums of $39,319.90 and $38,643.60 paid in 1928 and 1929, respectively, by the Company to Montreal Engineering Company as management fees pursuant to a contract therefor.

The Company contends that this new deficiency was barred by the statute of limitations. Section 60(a)(1) of the Income Tax Act provides that income taxes "shall be as-

sessed within five years after the return was filed . . . ''
(Laws of Puerto Rico, 1925, p. 520). If no other provision
of law were involved, the deficiencies herein—determined in
1936 for a 1929 return—would, of course, be barred by pre-
scription. However, the Treasurer contends, and the district
court held, that the statute of limitations was tolled in this
case for approximately three years, the period during which
the Company's appeal was pending before the Board of
Review and Equalization.

The Treasurer contends that this period is properly
added to the ordinary statutory period by virtue of §60(b)
of the Income Tax Act (Laws of Puerto Rico, 1925, p. 522),
reading as follows:

"The period within which an assessment is required to be made
by subdivision (a) of this section in respect of any deficiency shall
be extended (1) by 30 days if a notice of such deficiency has been
mailed to the taxpayer under subdivision (a) of section 57 and no
appeal has been filed with the Board of Review and Equalization,
or (2) *if an appeal has been filed, then by the number of days
between the date of the mailing of such notice and the date of the
final decision by the Board.*" (Italics ours).

The Treasurer's position is that the appeal filed by the
Company to the Board of Review and Equalization with
reference to the deficiency disallowing the hurricane losses
tolled the statute of limitations, pursuant to §60(b), as to
the *entire* 1929 return, enabling the Treasurer to assess an
additional deficiency, based on a wholly unrelated item of
income,.after the ordinary statutory period of five years had
run, but within the five years plus the period the appeal on
the original deficiency was pending.

We regard the case of *Commissioner of Internal Revenue*
v. *Wilson*, 60 F. (2d) 501 (C.C.A., 10th Circ., 1932), as in
point and decisive of the question before us. In that case,
shortly before the statute of limitations would have run, the
Commissioner determined a deficiency, which the taxpayer

paid without petitioning the Board of Tax Appeals for a redetermination. Thereafter, the Commissioner sent the taxpayer a notice of a new deficiency, on account of the tax for the same year, but otherwise unrelated to the original deficiency. This deficiency was concededly barred by the statute, unless the notice of the first deficiency had suspended the statute.

The Circuit Court of Appeals agreed with the taxpayer that (p. 502) "the statute is tolled only for the purpose of enabling the Commissioner to assess and collect the particular deficiency covered by the notice, the mailing of which is a condition of the suspending of the statute." The court held that, no appeal having been taken in connection with the original deficiency, the statute of limitations had not been suspended for any purpose, and that the claim on the new deficiency was therefore barred. In discussing the purpose of §272 (a) (formerly §274) of the Federal Act, the court said at pages 503–4:

"Manifestly the time in which the Commissioner may not assess should not be charged against him. Manifestly too, he should be granted a reasonable time in which to assess after he is free to act. The general purpose, then, of the subsection is to compensate the Commissioner for time taken from his 4 years; to make the 4–year limitation uniform in application; . . . The Conference Committee aptly describes the subsection as suspending the statute 'for the period during which, for any reason the Commissioner's hands are tied, and in addition assures him a period of at least 60 days after he is free in which to make the assessment or bring proceedings for collection.'

"There remains the inquiry, Was the Commissioner free to initiate proceedings to collect the item of $2,969.76 at any time during the 4–year statutory period? If he was, there is no reason why the time should be extended. If he was prohibited from moving as to this item, after his notice of the deficiency of $251.06, mailed on March 9, then the statute should stand suspended until 60 days after he was free to act. On this question the parties are in accord; both agree that the March 9 notice did not circumscribe his power to proceed as to the tax here involved. The Commissioner does not

exhaust his power to determine, within the statutory period, the tax legally due, by mailing a notice of part of the deficiency. He has the power, within the period of limitations, to make such reexaminations, rederteminations, and ressessments as may be necessary to collect the entire deficiency. *Holmquist* v. *Blair* (C.C.A. 8) 35 F. (2d) 10. The statute does not prohibit the assertion of additional deficiencies because a notice is outstanding as to a deficiency of the same year. On the contrary, the legislative history makes it entirely clear that Congress intended that the Commissioner should have such power. Section 274(f), as it passed the House, provided that after the Commissioner had notified the taxpayer of a deficiency, he should have no right to determine an additional deficiency for the same taxable year, except in circumstances not here present. The Senate adopted the recommendation of its Finance Committee 'that this provision be confined to cases where the taxpayer has appealed to the Board.' The House concurred. H. R. Rept. No. 356, 69th Cong. 1st Sess. pp. 39, 40. This section, section 274(f) of the act (26 USCA §1048d) now reads: 'If after the enactment of this Act the commissioner has mailed to the taxpayer notice of a deficiency as provided in subdivision (a), and the taxpayer files a petition with the board within the time prescribed in such subdivision, the commissioner shall have no right to determine any additional deficiency in respect of the same taxable year, except in the case of fraud, and except as provided in subdivision (e) of this section or in subdivision (c) of section 279.'

"In event a petition is filed with the Board, jurisdiction is conferred upon it to increase the deficiency asserted by the Commissioner, and to determine that additional tax or penalties be assessed, if claim therefor is asserted by the Commissioner before the hearing. Section 274(e) of the act (26 USCA §1048c). Reading these statutes together, we find a logical system without overlap: the Commissioner's authority to redetermine a deficiency is plenary until the taxpayer files a petition with the Board; from that moment on, power over that taxable year is exclusively with the Board, except where a jeopardy assessment is necessary, or in case of fraud.

"The conclusion is inescapable, therefore, that the Commissioner was free to initiate steps to collect the tax here involved for the full four years of the limitation statute. The statute is suspended only 'for the period during which the Commissioner is prohibited from making the assessment,' and for 60 days thereafter. No such period existed as to this tax."

It can be seen that the rule of law involved herein is simple. The statute of limitations is tolled while the Commissioner's—in our case, the Treasurer's—hands are tied. The *Wilson* case points out that if no appeal is taken, under the Federal Act the Commissioner is free to determine additional deficiencies within the original statutory period. Consequently, the first notice of a deficiency does not interrupt the running of the statute. In the same way, under our statute, even in the event of appeal, the Treasurer is free to determine additional deficiencies; and therefore we see no escape from the conclusion that in this jurisdiction the statute is suspended only as to the deficiency being appealed, and not as to any new and unrelated deficiency which the Treasurer might determine, long after the statute had run but while the appeal on the original deficiency was still pending.

Our Legislature has never incorporated in our Income Tax Act a provision similar to that of the Federal Act, whereby the Commissioner is prohibited from levying additional deficiencies if the taxpayer appeals from the original deficiency. As the district court correctly pointed out, the Treasurer may at all times within the statutory period determine additional deficiencies, even during appeal from an original deficiency. This power or right—perhaps we should say duty—of the Treasurer to determine additional deficiencies even though appeal is pending on the original deficiency, is the very reason why the statute is suspended by such appeal only for the original or related deficiencies, and not for wholly unrelated deficiencies determined by the Treasurer after the ordinary statutory period had run.

The Attorney General recognizes the force of this argument. In his brief on behalf of the Treasurer, he says, referring to the *Wilson* case:

"We agree with the decision of the Court in that case to the effect that the mere notice of a deficiency ought not to extend the

statute for 120 days for all purposes, because if that were true, the statute could be indefinitely extended by successive notices of other parts of the deficiency. The Court based its decision on the fact that the Commissioner was not during the said 120 days impeded in any manner from notifying the taxpayer of other deficiencies."

The Attorney General then goes on to say, referring to the Federal Act, that "The taxpayer having appealed to the Board of Tax Appeals the Commissioner could not determine any additional deficiency for the same year except in case of fraud or if a jeopardy assessment were necessary." But he overlooks completely the fact that under our statute, as under the 1924 Federal Act prior to the 1926 amendment thereof, the Treasurer is not prevented by appeal on an original deficiency from levying additional deficiencies. We therefore repeat that the Treasurer's hands not being tied by the appeal, there is no room for the contention in this jurisdiction that appeal from an original deficiency tolls the statute for subsequent unrelated deficiencies.

We find nothing in *Von Weise* v. *Commissioner of Internal Revenue,* 69 F.(2d) 439 (C.C.A., 8th Circ., 1934), cited by the lower court and relied on here by the Treasurer, to the contrary. In that case the taxpayer, in filing his appeal to the Board of Tax Appeals, conceded that part of the deficiency as found by the Commissioner was correct. His position therefore was that he had waived, as to the part of the deficiency conceded in his petition, the restrictions on the assessment and collection of that part of the deficiency; and that, consequently, the statute had not been tolled during the pendency of his appeal as to the conceded portion of the deficiency.

The Circuit Court of Appeals rejected this contention, holding in effect that since the taxpayer had taken an appeal as to the deficiency assessed, the Commissioner's hands were tied as to assessment and collection of the entire amount of the deficiency, and that therefore the statute as

to the deficiency as a whole had been tolled during the appeal. We fail to see how that holding can aid the Treasurer in this case. In the *Von Weise* case a single deficiency was involved, which the Court refused to let the taxpayer split up and treat piecemeal for his own purposes. Indeed, that is all that was meant by the statement in 5 Paul and Mertens, Law of Federal Income Taxation, §50.70, p. 579 that "Where an appeal is taken, however, the extension of the statute applies to the entire deficiency." [1] Our situation is wholly diffierent. This case does not consist solely of a single deficiency from which appeal was taken. We have a deficiency and appeal therefrom; and then, after the statute would otherwise have barred it, and indeed after the taxpayer had been vindicated in its position on the original deficiency, a claim by the Treasurer that the first deficiency tolled the statute for an entirely unrelated additional deficiency. Under those circumstances, we find the doctrine of the *Wilson* rather than the *Von Weise* case applicable.

*Parish-Watson Co.* v. *Anderson,* 34 F.(2d) 322 (Dist. Ct., S.D.N.Y., 1929), the only other case cited by the district court in support of its holding on this point, is inapposite. That case involved only the question of whether a waiver or agreement by the taxpayer for a limited period as to a tax allegedly due under a previous Act could be further extended by a statute enacted after the date of the agreement. There is nothing in it by way of language or holding which bears any relation to the problem before us.

As already noted, under the Federal law the Commissioner loses jurisdiction to determine additional deficiencies once the taxpayer appeals the original deficiency. It should perhaps also be noted that the *Wilson* case casts doubt on the proposition that the Commissioner may, under those cir-

---

[1] This becomes even clearer upon examination of *Sooy* v. *Commissioner of Internal Revenue,* 40 F.(2d) 634 (C.C.A., 9th Circ., 1930), cited by Paul and Mertens to sustain their statement.

cumstances, present even to the Board a wholly unrelated deficiency which was otherwise barred by the statute. However, be that as it may, we point out once more that the parties and the district court agree that, unlike the Federal Commissioner, the Treasurer is not inhibited under our act from making additional deficiencies even while appeal from one deficiency is pending. Mertens points this out when he indicates that "Under the 1926 Act the Commissioner could not determine additional deficiencies after an appeal to the Board (as he could under the 1924 Act), but he was enabled to urge additional deficiencies before the Board, which was given full jurisdiction to determine the correct amount of the tax liability for the taxable year in question. . . ." (9 Mertens, Law of Federal Income Taxation, §49.09, p. 12).[2]

To state the problem shortly, the purpose of the statutory provision involved herein was to toll the statute of limitations during the period the tax official's hands were tied (Seidman's Legislative History of Federal Income Tax Laws, pp. 552, 630, 763.) Since, under our Income Tax Act, appeal from one deficiency does not prevent the Treasurer from determining additional unrelated deficiencies, such appeal does not toll the statute for the purpose of determining such additional unrelated deficiencies.

We therefore hold that the deficiency of approximately $10,000 in connection with the management fees paid by the Company in 1928 and 1929 had prescribed by 1936, the date it was determined by the Treasurer.[3] The district court therefore erred in entering judgment for the Treasurer on the first cause of action.

## II

■ We next examine on the merits the judgment of the district court sustaining the action of the Treasurer in re-

---

[2] It should be borne in mind that our Act was copied from the 1924 Federal Act and has not been amended in this respect.

[3] We need hardly add that under §61(a) of the Income Tax Act, there is no limitation on assessment and collection of a tax in case of fraud.

ducing to $5,000 annually the deductions for the management fees paid pursuant to a contract therefor as follows:

| | |
|---|---|
| 1931 | $41, 989. 21 |
| 1932 | 34, 205. 29 |
| 1933 | 35, 057. 87 |
| 1934 | 39, 038 .44 |

The district court found that management fees as such were ordinary and necessary expenses deductible from taxable income under §32(a)(1) of the Income Tax Act. The lower court, however, held that the evidence submitted had not put it "in a position to determine if the Treasurer of Puerto Rico acted arbitrarily in fixing the sum of $5,000 as reasonable compensation for management fees for each of the years under discussion, and it is therefore our duty to accept that the said sum is reasonable compensation, inasmuch as the testimony of the plaintiff has not been sufficient to destroy the presumption of correctness of the action and determination of the Treasurer."

We therefore turn to an examination of the proof of the Company on this point. We shall, as suggested by counsel, examine this testimony in the light of some of the tests laid down in 3 Paul and Mertens, *supra,* §§23.81–23.115, pp. 76–104 (to the same effect, 4 Mertens, *supra,* §§25.44–25.67, pp. 395–432).

In determining the reasonableness of such compensation, the ratio of the payment to gross income is significant. In the instant case the management fee paid to Montreal Engineering Company represented 2½ per cent of the gross income. And except for two hurricane years the company from 1928 to 1934 paid dividends on its invested capital from 8½ per cent to 14 per cent. It would therefore seem that the fees were not disproportionate to income.

Paul and Mertens also point out that salaries or other compensation for services should bear a reasonable relation

to the size of the business involved. Here we have a company furnishing light and electric power to one-half of Puerto Rico and one-half of its population, with a book value fluctuating during the years in question between ten and twelve million dollars, with a gross income of approximately $1,500,000 annually. In this connection, the Company's testimony was that the personnel in its employ consisted solely of operational personnel, and that it would be required to add $75,000 to $100,000 annually to its payroll if the functions now performed by the Montreal Engineering Company were to be taken over by the Company itself. Under these circumstances, the fees, which averaged less than $40,000 annually, do not seem unreasonably unrelated to the size of the business of the company.

The Company's testimony also was to the effect that Montreal Engineering Company renders supervisory and engineering services to eleven public utility companies in Central and South America, Puerto Rico, and Canada, and that it maintains an organization, of 35 to 60 persons, consisting of eight departments, including accounting, engineering, rate and appraisal and purchasing. These departments are all staffed by personnel who are specialists and who are familiar with the business of the companies being supervised. The testimony was that the arrangement in question was particularly valuable after the hurricanes in 1928 and 1932, when the Company received innumerable services set forth at great length in the record in connection with purchases, reconstruction, and other matters necessary for the reestablishment of the Company's business of furnishing power in Puerto Rico. In the same way, Montreal Engineering Company furnished to the Company the technical personnel required for an extensive rate case conducted before the Public Service Commission and in the Courts in 1934.

According to the testimony, Montreal Engineering Company maintains offices in Montreal, New York and London

for purchasing purposes. Through their contacts with manufacturers and their system of central purchasing for the eleven companies they serve, they have effected large economies in purchasing materials. In the testimony for the Company it was estimated that these economies represented ten per cent of the total prices for purchases made from 1928 to 1934, amounting to approximately $8,500 to $12,000 a year. One example given was a saving for the Company of $10,500 on the purchase of oil alone in 1934. The testimony was that the saving to the Company as a result of such purchasing was 49 per cent of all the management fees paid during the years involved. It is difficult to see how the Treasurer could reasonably find that only a $5,000 a year management fee was justified, when he made no effort to contradict the testimony of the Company that the management contract saved it $20,000 a year on the purchase price of materials alone.

Montreal Engineering Company did all the negotiating and paper work required for purchase of materials, which must all come from outside of Puerto Rico. The Company therefore points out that, in addition to the savings in purchase price of materials, it has saved the expense of maintaining a purchasing agent and an office or offices outside of Puerto Rico for that purpose.

The testimony also was to the effect that Montreal Engineering Company was constantly engaged in studying rates through its rate experts, and gave the Company its advice on labor problems which was valuable due to its experience with other companies.

One of the tests used by Paul and Mertens is a comparison of the compensation paid by others for similar services. No such evidence was offered by the Company. Counsel for the Company assert here that no similar situation exists in Puerto Rico. However, testimony was offered that, although Montreal Engineering Company kept no cost accounting

system for the years in question, such a system was established thereafter, and that for 1936, 1937 and 1938 the costs of Montreal Engineering Company properly allocable to the Company were approximately $38,000 a year, whereas the fees for those years for services substantially identical to those paid for in the years in question were approximately $39,000 a year. Under those figures, Montreal Engineering Company would not seem to be making an undue profit on the management contract.

Another test is whether the compensation paid bears a close relation to stock holdings. There was no testimony that Montreal Engineering Company held any stock in the Company, or even, as the district court found, "that the directors of Montreal Engineering Company were also the directors of the plaintiff". The district court may have been led into error on this last point because one witness testified that he was a director of both the Company and the Montreal Engineering Company. But there was no evidence of complete identity of the directors of both companies.

Compensation paid in previous years for similar services is also taken into consideration on the question of reasonableness. Here the Treasurer never questioned similar management fees paid from 1919 to 1927 and in 1930. During all these years payment was computed on the same basis; namely, 2½ per cent of the gross revenue of the Company.

The cases and the aforesaid texts also indicate that if the date on which the compensation is fixed is before the term of employment begins, and consequently before the profits are known, this is a factor indicating that the compensation is reasonable. The facts herein are exceedingly strong on this point. In this case, not only was the compensation fixed before employment began, but the first contract was executed in 1911, when the Income Tax Act had not as yet been passed. It is therefore difficult to see how could it be contended under those circumstances that the purpose

of this management contract was to distribute profits under the guise of payments for services to avoid the payment of income taxes.

Another factor in determining whether such compensation is reasonable is whether the directors have acted with respect thereto. In the instant case the testimony was that the compensation involved had been paid by virtue of contracts approved by the directors.

Finally, it cannot be gainsaid that close corporations frequently lend themselves to profit-sharing in the guise of salary payments. Nevertheless, even if we assume that through devices not necessary to detail here, the Montreal Engineering Company controlled, or at least had a large voice, in the affairs of the Company, "The conclusion is not to be inferred that salaries are *ipso facto,* unreasonable because paid by a close or family corporation. The inference is rather that in these cases the taxpayer may be confronted with the problem of offering stronger proof of reasonableness than in other situations." (3 Paul and Mertens, *supra,* §23.111, p. 101). See also *Sobrino de Izquierdo, Inc.* v. *Sancho Bonet, Treas.,* 56 P.R.R. 173; *Heywood Boot & Shoe Co.* v. *Commissioner of Internal Rev.,* 76 F. (2) 586 (C.C.A., 1st Circ., 1935).

The lower court held that the evidence presented was not sufficiently detailed and that since the taxpayer had not met the burden of showing that the compensation paid was reasonable, the presumption that the Treasurer as a public official had acted correctly would prevail. It is difficult to see, in the light of what has been recited above, how the Company could have presented more details to justify the management fees involved, unless it had retraced every step the Company had taken for the various years involved. As it was, the record is exceedingly voluminous. And as has been pointed out, "In connection with the proof of amounts spent

too much stress cannot be placed on the desirability and importance of a liberal rule. True it is that the sound administration of tax statutes requires the taxpayer to sustain the burden of proof. At the same time both Board and courts should recognize that expense deductions are not isolated, infrequent occurrences. To require the taxpayer to submit the same degree of proof in connection with daily expenses as is required in an unusual transaction is to ignore practical considerations and to impose a too onerous rule. . . ." (3 Paul and Mertens, *supra*, §23.168. p. 155). See *Cohan* v. *Commissioner of Internal Revenue*, 59 F.(2d) 540, 543–4 (C.C.A., 2d Circ., 1930) ; *Rugel* v. *Commissioner of Internal Revenue*, 127 F.(2d) 393 (C.C.A., 8th Circ., 1942).

In contrast to the efforts of the Company to demonstrate the reasonableness of the compensation involved, the Treasurer offered no evidence whatsoever. The lower court therefore had before it solely the unchallenged evidence of the Company. We feel that the Company met the burden, of proof in demonstrating that the compensation which its contract required it to pay Montreal Engineering Company as management fees was reasonable within the intent of §31.(*a*) (1) of the Income Tax Act. We emphasize that nothing we have said impairs the right of the Public Service Commission to examine the situation in this or any other case and to determine if, as a matter of public utility regulation, such a management fee is proper. Indeed, a number of the cases cited by the Treasurer involve just such situations. But we are unable to conclude that it was appropriate to obtain this result, at least in this case, through the medium of an income tax suit. We therefore conclude that in the instant case the district court erred in sustaining the action of the Treasurer in reducing the management fees for 1931, 1932, 1933 and 1934 from the figure provided in the contract to $5,000.

## III

█ Our third problem herein concerns the returns for 1931–34. During those years the Company paid its President an annual salary of $10,000, and in its return deducted approximately $9,000 thereof as necessary expenses incurred in carrying on their business. The Treasurer disallowed these deductions on the ground that they were not reasonable. The lower court found that the amount involved was reasonable compensation for the services rendered, and therefore sustained the deductions for 1933 and 1934. However, the lower court, for reasons to be presently noted, sustained the Treasurer in rejecting the deductions for 1931 and 1932. Both parties appealed from the portion of the judgment adversely affecting them.

The Federal Acts, since 1918, in referring to deductions from taxable income, have contained a specific provision that the "ordinary and necessary" expenses shall include "a reasonable allowance for salaries or other compensation for personal services actually rendered." However, even before the insertion of this clause in the said Acts, specifically permitting deductions for salaries, the Federal Courts held that the broad phrase "ordinary and necessary expenses" included reasonable salary payments (*Becker Bros.* v. *United States,* 7 F. (2d) 3 (C.C.A., 2d Circ., 1925); *United States* v. *Philadelphia Knitting Mills Co.,* 273 F. 657 (C.C.A., 3rd Circ., 1921); *Botany Mills* v. *United States,* 278 U. S. 282, 292).

Our statute has had a curious history. Section 32(a) of the Income Tax Act, from 1925 to 1927, read in part as follows:

"Section 32.—(a) In computing the net income of a corporation or partnership subject to the tax imposed by section 28 there shall be allowed as deductions:

"(1) All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, *includ-*

*ing a reasonable allowance for salaries or other compensation for personal services actually rendered . . .''* (Italics ours).

Act No. 18, §5, Laws of Puerto Rico, 1927, which went into effect January 1, 1928, added the phrase "to employees" after "compensation" in the said Section. But Act No. 30, §2, Laws of Puerto Rico, 1932, which went into effect January 1, 1933, once more eliminated the phrase "to employees" from this Section, restoring the original 1925 version.

In the instant case the district court held that from 1928 to 1933, while the statute contained the phrase "to employees," a salary paid to a president of a corporation was not deductible from the taxable income of the corporation on the ground that the president of a corporation is not an employee thereof. It therefore disallowed the deductions for 1931 and 1932, in spite of the facts (*a*) that the district court found that the President had rendered considerable services to the Company for which $10,000 annually was reasonable compensation, and (*b*) that it sustained the position of the Company in deducting the salary thus paid from its taxable income for 1933 and 1934, when the phrase "to employees" no longer appeared in the statute.

This court has already passed on the purpose of the amendment inserting the phrase "to employees" in the statute. "By the law of 1925 the deduction for salaries was limited to 'a reasonable allowance for salaries or other compensation for personal services actually rendered.' This, of course, included salaries paid to employees. The purpose of the amendment was to distinguish between the employees and the officers in the case of a corporation and between the employees and the managing partners of a limited partnership. It was to place a further limitation upon the amount of the deduction. The allowance for salaries was limited to those paid to employees. By necessary implication salaries paid to the managing partners of a limited partnership *or*

*to the officers of a corporation as such managing partners or offices*, were excluded." (*Moscoso Bros. & Co., S. en C. v. Domenech,* 44 P.R.R. 11, 12; italics ours).

As indicated in the *Moscoso* case, the previous law already permitted the deduction of salaries paid to employees. The purpose of the amendment was therefore simply to exclude deductions for payment of salaries *as officers of a corporation*. But we do not understand this to mean that a President of a corporation could not be paid compensation for personal services actually rendered beyond those of a mere perfunctory nature such as some presiding officers render. To put it shortly, we find nothing in the statute preventing deduction for payments to an employee, who is also President.

This court has already passed by implication on this point. In a case in which it was held that compensation paid to a partner could not be deducted from its taxable income by a partnership, we distinguished the case of a corporation in the following language:

"This is so because the partner, owing to the very nature of the partnership contract, cannot, at any time, be an employee of the partnership to which he belongs. It is true that the partnership, in the civil law, is a juridical entity different from its partners, but it is no less true that in the partnership, contrary to what happens with the stockholder in a corporation, the partner owes to the partnership his work and diligence, and in consequence when he works for the partnership he does it in fulfillment of his duty as partner. In the corporation, the stockholder invests his capital in the business and as evidence of his investment he receives shares, but is not bound to work for the corporation, which transacts its business *through employees or officers who receive compensation for work which they perform independently from their status as shareholders, if they happen to be such.*" (*Cabrero v. District Court,* 58 P.R.R. 535, 537; Italics ours).

In brief, we find that the addition of the words "to employees" to the statute emphasizes that salaries paid by

corporations can be deducted from the taxable income of a corporation only in the event that services are actually rendered therefor. But we find nothing in the statute, or in corporate practice, which prevents an officer of the corporation, whatever his rank may be, from performing services as an employee other than those he might perform as a routine matter as such officer. And if he actively engages in such work as an employee and is reasonably compensated therefor, the statute as it was written from 1928 to 1933 permitted a corporation to deduct such payments from its taxable income.

Our conclusion herein is fortified by the fact that even before the Federal Act and our Act were amended to provide specifically that "ordinary and necessary" expenses shall include "a reasonable allowance for salaries or other compensation for personal services actually rendered," the Federal courts held, as already noted above, that the broad phrase "ordinary and necessary expenses" included reasonable salary payments. It would therefore seem clear that, at least as to such expenses incurred by corporations, the elimination of the phrase "to employees" from the statute during a limited period, had little, if any, legal effect.

We therefore feel that, under the circumstances of this case, the conclusion we reach for the 1931 and 1932 deductions should be the same as for 1933 and 1934, provided the services rendered were substantially the same for all four years. The district court found that the President's personal services in 1933 and 1934 were substantial, and that $10,000 annually was reasonable compensation therefor. We have examined the evidence, and we find nothing in the record which would warrant disturbance of that conclusion. (See *Sobrinos de Izquierdo, Inc., v. Sancho Bonet, Treas.,* 56 P.R.R. 173; *L. E. Pinkham Med. Co. v. Com'r of Internal Revenue,* 128 F.(2d) 986 (C.C.A., 1st Circ., 1942); *United States v. Reitmeyer,* 11 F. (2d) 648 (Dist. Ct., La., 1926).

While the district court made no express finding on that point, we are satisfied on an examination of the record that the President's services were substantially the same for the four years in question. We therefore hold that the district court acted correctly in permitting the 1933 and 1934 deductions, but erred in disallowing the 1931 and 1932 deductions.

## IV

■ The last question concerns credits claimed by the Company for 1931, 1933 and 1934 in the amounts of $24,743.58, $18,075.86, and $18,629.98, respectively. These sums were received as interest at the rate of 9 per cent annually on past due accounts for electric power furnished to various municipalities pursuant to contracts providing for the said interest under such circumstances.

Section 34(a) of the Income Tax Act (Laws of Puerto Rico, 1925, p. 482) reads in part as follows:

"For the purpose only of the tax imposed by section 28 there shall be allowed the following credits:
"(a) The amount received as interest upon obligations of the United States, any political subdivision thereof, upon the obligations of The People of Puerto Rico, or any political subdivision thereof . . . "

The question to determine is whether the amounts thus received are "interest upon obligations" of the municipalities involved. The Supreme Court of the United States, in examining a similar provision, has said that "It is clear from a consideration of the entire section and of the subject matter that the purpose of Congress, in thus excluding from gross income interest upon such obligations, was to aid the borrowing power of the federal government by making its interest-bearing bonds more attractive to investors. *American Viscose Corp.* v. *Com'r of Int. Rev.*, 56 F.(2d) 1033. Compare *United States Trust Co. of New York* v. *Anderson*, 65 F.(2d) 575, 577–578. The scope of the word 'obligations'

as there employed must be narrowed accordingly, and not extended to include interest upon indebtedness not incurred under the borrowing power, as the court in the *Viscose* case properly held." (*Helvering* v. *Stockholms Enskilda Bank,* 293 U. S. 84, 87). See *Baltimore & O. R. Co.* v. *Commissioner of Internal Rev.,* 78 F. (2d) 460 (C.C.A., 4th Circ., 1935); 121 A.L.R. 1276; 1 Mertens, Law of Federal Income Taxation, §7.21, p. 333, §7.23, pp. 337–8. The best and most recent discussion of this question is found in *Holley* v. *United States,* 124 F.(2d) 909 (C.C.A., 6th Circ., 1942).

A debt contracted for electric light furnished to a municipality is not a debt contracted in the exercise of its borrowing power. The district court therefore acted properly in sustaining the action of the Treasurer in disallowing the credits in question.

For the reasons set forth herein, the judgment of the district court will be modified, and a new judgment will be entered granting Porto Rico Railway, Light and Power Company the relief prayed for herein, except that judgment will be entered for the Treasurer on the claims relating to the interest collected by the Company from municipalities.